# EXHIBIT A

## DETENTION DATE

## 8/11/04

**U.S. Department of Justice**
Immigration and Naturalization Service

**Warning for Failure to Depart**

| Name: | | District Office: | File #: |
|---|---|---|---|
| Augustus Charles NOHA | | MIA | A29 979 444 |

*Correct A#*

Section 243(a) of the Immigration and Nationality Act provides, in part, that:

Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a) who--

(A)    willfully fails or refuses to depart from the United States within a period of 90 days* from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

(B)    willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

(C)    connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

(D)    willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

Nothing in this section shall make it a violation to take proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

Any action the Immigration and Naturalization Service may take to obtain a travel document for your departure or to remove you will *NOT* relieve you of the liability for compliance with the provisions of law referred to in the first paragraph above.

\*    Section 241(a)(1)(C) provides for the extension of the statutory removal period if the alien refuses, during the removal period, to make application in good faith, for a travel or other document necessary for the alien's removal or departure or conspires or acts to prevent the alien's removal subject to an order of removal.

| Date Order Final: | Ordered Removed under Section: |
|---|---|
| June 30, 1999 | 241(a)(2)(A)(ii) & 241(a)(2)(A)(iii) |

*\* Never entered into evidence*
*\* Still qualifies for waivers based on the charge*

**Record of Service**
(Check method used)

**Record of Personal Service**

| Served By: (Print Name and Title of Officer) | | Date: |
|---|---|---|
| Sean Teeling, Deportation Officer | | 08/11/2004 |
| Officer's Signature: *Sean Teeling* | Location of Service: Miami DRO Field Office | |
| Served On: (Alien's Signature) | | Date: 08/11/2004 |

| ( ) Warning administered in Court (Copy of order attached) | Record of Personal Service (Cont.) |
|---|---|
| ( ) Certified Mail Service | Fingerprint of Alien (Specify finger used) |

**Attach certified mail receipts here.**

Form I-229(a)
(Revised 12/04/02)

EXHIBIT A
REQUEST FOR REVIEW

EX #1B1T   A

Augustus Chales Noha
29-979-444
18201 SW 12 street
Miami, Florida 33194

Dear Sir,

Re: **Ninety-Day Review (8 CFR 241.4(d)(1)**

     I wish to bring to your notice that I have been detained at the above facility since **August 11th, 2004.** I have not yet had a **ninety-day review,** as it is refenreced in 241(a)(3). To update you my offense was credit card fraud. Incaceration time was 4 months. Conviction was September 19th 1996 (8years ago). I have a motion to re-open currently pending with the Board of immigration Appeals. In which I am seeking INA 241b(b)(3), article 3 of Covention Against Torture 8 CFR §208.16(c).

     241(b)(3) provides in pertinent part "The Attorney General shall not deport an alien, if alien's life or freedom would be threatened on the account of race, religion, nationality, membership of particular social group, political opinion." _See Matter of Exilus 18 I § N Dec 276_ (BIA 1982) ("Justice requires that an applicant for asylum or Witholding of Deportation be afforded a meaningfull opprotunity to establish his case") See ex 11, 12 _(Attorney General's order # 2734-2004). Some aliens at Krome have been release or paroled, in response to that order effective Oct 28th 2004._ Petitioner is amoungst the narrow section referenced in the said order. The only barring factor post this order, was that petitioner did not qualify because he pled guilty on May 17th, 1996 and AEDPA became effective on April 24th 1996. So the courts including the BIA stipulated that petitioner did not qualify for that relief. But by virtue of the new revised standards including all aliens that pled guilty before _April 1st, 1997_ (That were not incacerated for more than 5 years) petitioner qualifies to apply for the relief. Petitioner's attorney is preparing a special 212(c) motion to this effect. Furthermore petitioner meets all the conditions referenced in _exhibits 22, 30_ (attached herewith)

### Medical Condition
     Petitioner has been detained for aproximately 4 months and has not yet received prescribed medical sugeries to rectify injuries referenced in medical records attached. Petitioner has notified Krome medical staff of these conditions, which are

progressively getting worse. But I am yet to receive, the medical care required. My condition was pre-existing; I sincerely did not expect Krome to bear the cost of those two major sugeries. I have medical insurance that was going to pay for the sugeries, prior to getting to Krome. But if Krome would cover 100% of the said sugeries, I would sincerely be gratefull. Because my medical insurance covers 95% (5%) comes from my pocket. Both procedures would cost aproximately $350K ($185,000, $164,00 respectively) according to primary physicians estimates. Recovery time is 18-24 months

### Release Conditons

I am not a flight risk or a threat to public safety as referenced in *exhibits 22, 30.* I have been rehabilated and lived a productive life since 1996. That I made that a fatal error; I am currently employed by Planet Automotive in Miami Lakes, Florida. Job that I have had for the past 7 years. I still have a $50,000 bond that was the condition for my release since 1996. (They could utilse the same bond as condition for release. It is still effective.) I am willing also, if the depatment decide against utilising the department decides against utilising the said bond. To adhere to any release conditions that ICE may consider as appropriate for aliens in like situation.

### Equity

I have been married for 13 years to an American Citizen, have a 12years old daughter. Lived in South Florida for the same period of time. Currently a member of the Admistrative Board at Miami Lakes United Methodist Church. Remorsefull 1st times offender. Gainfully employed taxpayer. Also paying restitution to the US District Court. Petitioner acknowledges his debt to society plegdes, upon release to continue to be off good conduct. See exhibit 2, petitioner meets the entire requirement as evidence in exhibit 30, with to the said exhibit.

*Item 1:* Petitioner country would not accept him current medical condition. Surgery and recovery time is aproximately 18-24 months. The consular office considers him as a medical burden. Also petitioners insurance would not be valid for treatment abroad.

*Item 2:* Petitioner is completely non-violent and would continue to maintain that status upon release.

*Item 3:* Petitioner has been out on bond for 8 years, and had no incidences. Petitioner during his conviction completed 3 years of supervised release with no infractions.

Item 4: Petitioner does not pose any flight risk, whatsoever, he further acknowledges, if this grace is accorded him it would amount to " utmost ignorance" to flee. Petitioner during the 8 years of being on bond reported for every appointment.

## Conclusion

Petitioner pleads with authorities to show mercy and leniency in evaluating his review. He would have been detained for aproximately 4 months on the 11th of December. Has not have any issues with the authorities. Petitioner still has his job waiting for him and would continue to pay his restitution of aprox $33k. Petitioner pleads with authorities to enable him to get some urgent medical care, he is currently confined to a wheel chair, and Krome Detention center was not designed to accoomodate handicaped detainees. It is very hard for me to move around, take showers. I have volunteers that currently assist me. Thank you for your anticipated assistance. I sincerely appreciate your kindness. God Bless You. Petitioner continues to ask for forgivance and be allowed one last chance for this 8 years old infraction. Prays that somebody will please forgive him even if he has pay off the balance of his restitution in one instalment.

Cc: Office of Inspector General

Cc: Department Homeland Security

Cc: White House\ George W. Bush

Cc: Linda Osberg Brain, ESQ

Cc: Mike Rozo, ICE Miami

Cc: Director HQPPDU Washington

Respectfully Submited

Augustus Charles Noha

Date

# RESPONSE TO

# DECISION TO

# CONTINUE DETENTION

## EXHIBIT B

Augustus C Noha
18#201 SW 12 st
Miami, FL 33194
#29-979-444
2/3/2005

HQ-PDU
801 I street, suite 800
Washington, DC 20536

**Re: Decision to Continue Detention**

I am in reciept of your decision to continue review. Ther #are a few discrepancies in the said

correspondence. My date of arrival was August 11, 2004.

(1) The warrant was not outstanding. I had a final order of deportation. ICE sent me a bag and baggage

letter I reported, but was released to continue assisting the government on the grounds that I purchase a

ticket and surrender my passport. ICE would contact me in writing if I am needed or call my attorney

who negotiated the release. I did not get any correspodence requesting me to come in neither did my

attorney.

(2) ICE did not receive any travel document for my removal. Both issues were ~~dated~~ *denied* on the agreement that

**ICE would allow me get immediate medical attention. The embassy refused to issue travel**

**document pending I gets treatment.** The said medical emergency has still not being addressed as of

the time of this letter. The medical situation has gotten worse. ICE has neither treated the condition nor

allowed me to treat myself. After three (3) months of the said agreement. The decision does not mention

if it was a 90 days review or a 6 months review. No mention was made of the medical reasons that were

the grounds for travel document denial. Neither were grounds for the waivers that are due me

referenced. The Nigerian Embassy notified ICE that I should not be removed in my current condition. I

have been held in custody and yet to be treated.

**Humanitarian Appeal**

There is glaring evidence that respondent has serious medical conditions, see medical records.

These issues have not been addressed. These injuries were sustained in the Untied States. The respondent

cannot get treatment , if he were removed to a country that he left 15 years ago. Respondent is on

aproximately **20 pills daily**, both both hypertension and acute pain. Any attempt to remove respondent in

current condition is not envisaged. Respondent continues to pray upon authorities for mercy. The relevant

crime for which removal actions are being taken occured 8 years ago. Petitioner was incarcerated for four

(4) months for that crime in 1996. Petitioner *has* been held in ICE custody for 8 months ( 2 months in 1996,

6 months in 2004. That is aproximately twice the time for the relevant conduct. Respondent went through

serious agonizing times on his last removal attempt (spanning from New Orleans, New York). That included

sexual harrasment, cruelty by way of putting respondent in solitary confinement, refusal to give medication,

placing respondent with dangerous criminals. These issues has been *referd* to the Office of Inspector

General for correction.

This country was founded under **God**, " One Nation under **God**", "In **God** we trust" Every oath is ended with " so help me **God**". The respondent is a devout christian and the Bible teaches us in the book of Mathews 6:14-15; 22:36-40; Mark 10:7-9; Luke 17:3-4; John 13:34-35. The bible further teaches all man men have sinned, but we have to acknowledge our sins and ask for forgivance. "Forgive our tresspasses as we forgive those who tresspasses against us." I have absolute faith that God will deliver me from this turmoil. I have prayed continously for over 8 years to be given just one chance to live a new leaf with my family. I know God has forgiven me for my wrongdoing. Would man forgive me? I am currently faced with a one strike and you are out scenario. May God continue to guide project and bless you in Jesus name! Amen.

Your's in Christ

Augustus C Noha

EXHIBIT C

DECISION TO
CONTINUE DETENTION
2/1/05

REVIEW DENIAL

EXHIBIT C

Krome Service Processing Center

**U.S. Department of Homeland Security**
18201 SW 12th Street
Miami, FL 33194



U.S. Immigration
and Customs
Enforcement

NOHA, Agustus                                    A29 979 444
C/O Krome SPC
18201 SW 12 Street
Miami, FL. 33194

## Decision to Continue Detention
## Following File Review

   This letter is to inform you that your custody status was reviewed by the Immigration and Customs Enforcement (ICE) and that you will not be released from custody at this time.

   This decision was based on a review of your file record and consideration of information you submitted to ICE reviewing officials.

   You came into ICE custody with an outstanding Warrant of Deportation. ICE was in communication with the Nigerian Embassy and obtained a Travel Document. The Embassy also approved your removal to Nigeria. ICE is currently taking appropriate action, and is pending issuance of a subsequent Travel Document. You are not being released because ICE is making the necessary arrangements to effect your removal to Nigeria. Considering the Embassy's prior cooperation, ICE is continuing efforts to effect your removal to Nigeria.

   The HQ-PDU will conduct a further review, within thirty days of this notice or as soon as possible thereafter, of the date of this notice. It is in your best interest to maintain proper behavior while awaiting this review. If you have any information you want to submit, please forward to, DHS-ICE-HQ Post Order Custody Review Unit (HQ-PDU) at 801 I Street, Suite 800, Washington, DC. 20536. For further information, please contact officer listed below:

Deportation Officer M. Rosario at: (305) 552-1845 Ext. 113
       Officer Name

Krome SPC, 18201 SW 12TH STREET, MIAMI, FLORIDA 33194
                      (Address)

Signature of District Director/Designated Representative                    Date

(Page 1 of 2)

**Decision to Continue Detention Following File Review**
**Page 2**

NOHA, Agustus                                    A#29-979 444

<hr>

## PROOF OF SERVICE

**(1)    Personal Service (Officer to complete both (a) and (b) below.)**

(a)    I Marcy Rosario ~~_____~~ , Deportation officer
               Name of ICE Officer                              Title

certify that I served NOHA, Agustus          A#29 979 444      with a copy of
                          Name of detainee

this document at Krome SPC  on ~~01/27/2005~~ 2/1/05 , at 1900HR8
                     Institution              Date              Time

(b)    I certify that I served the custodian _____ ,
                                                        Name of Official

_____ , at _____ , on
     Title                     Institution

_____ with a copy of this document.
     Date

OR

**(2)    Service by certified mail, return receipt.  (Attach copy of receipt)**

I _____ , _____ , certify
            Name of INS Officer                    Title

that I served _____ and the custodian _____
                     Name of detainee                         Name of Official

with a copy of this document by certified mail at _____ on _____ .
                                                        Institution          Date

( ) CC: Attorney of Record or Designated Representative  ) CC: A-File

EXHIBIT D

NOTICE FOR CUSTODY
REVIEW    12/30/04

EX HIB D



## Department of Homeland Security
## U.S Immigration and Customs Enforcement

*18201 SW 12 Street*
*Miami, Florida 33194*

NOHA, Augustus Charles                                    A29 979 444
C/O Krome SPC
18201 SW 12 ST
MIAMI, FL 33194

# Notice to Alien of File Custody Review

You are detained in the custody of the Immigration and Customs Enforcement (ICE) and you are required to cooperate with the ICE in effecting your removal from the United States. If the ICE has not removed you from the United States within the removal period as set forth in INA 241(a) (normally 90-days) of either: 1) your entering ICE custody with a final order of removal, deportation or exclusion, or 2) the date of any final order you receive while you are in ICE custody, the ICE deciding official will review your case for consideration of release on an Order of Supervision. Release, however, is dependent on your demonstrating to the satisfaction of the Secretary of Homeland Security that you **will not** pose a danger to the community and **will not** present a flight risk.

Your custody status will be reviewed on or about: **(December 30, 2004)** . The Deciding Official may consider, but is not limited to considering the following:

1. Criminal convictions and criminal conduct;
2. Other criminal and immigration history;
3. Sentence(s) imposed and time actually served;
4. History of escapes, failures to appear for judicial or other proceedings, and other defaults;
5. Probation history;
6. Disciplinary problems while incarcerated;
7. Evidence of rehabilitative effort or recidivism;
8. Equities in the United States;
9. Cooperation in obtaining your travel document.
10. Any available mental health reports.

You may submit any documentation you wish to be reviewed in support of your release, prior to the date listed above, to the attention of the Officer and address below. English translations must be provided pursuant to 8 CFR 103.2(b)(3). An attorney or other person may submit materials on your behalf. The district director will notify you of the decision in your case. Attached to this notice a list of free or low cost legal representatives who may be able to provide assistance to you in preparing your case.

United States Department of Homeland Security
Bureau of Immigration and Customs Enforcement
Krome Service Processing Center
**Attn: M. Rosario, Deportation Officer**
18201 S.W 12th Street
Miami, Florida 33194

## METHOD OF SERVICE

I certify that this form was provided to the alien by:               xx (Hand)                    (Institution Mail)
(x) CC: Attorney of Record or Designated Representative     KROME  SPC
(x) CC: A-file

_____                          M. Rosario, Deportation Officer          12/29/2004
Signature of Officer                          Print Name of Officer                          Date

I WAIVE MY 30 DAY NOTICE AND WANT MY REVIEW COMPLETED _____          12/30/04
(Final 10/23/02)

EXHIBIT

D1

INVITATION FOR SWEARING
IN AS A CITIZEN

EXHIBIT
D1

U.S. Department of Justice
Immigration and Naturalization Service

Notice of Naturalization

Naturalization and Citizenship Branch

7880 BISCAYNE BLVD. MIAMI, FL 33138
MIAMI, FL 33138

File or A #

A29 972 444

EXAMINER ID: MIAEXAM3

You are hereby notified to appear for an interview on your (your
child's) application for naturalization at the DATE, TIME and
PLACE shown below.

Date  9/24/1996
Time  8:09 AM

Place  7880 BISCAYNE BLVD.
MIAMI, FL 33131

AUGUSTUS NOHA
2428 NW 132 ST
MIAMI      FL 33167

Date

10/04/1996

You MUST BRING the following with you:

• This letter.
• Alien Registration Card.
• Any evidence of Selective Service Registration.
• Any documents you have which you used in connection with any entries into the U.S.
• Those items noted on the reverse side of this letter which are applicable to you.

ROBERT WALLIS
DISTRICT DIRECTOR

IMPORTANT — PLEASE SEE REVERSE

Form N-450A (Rev. 5/23/94) Y

LETTER TO

HEADQUARTER REVIEW
AFTER REVIEW

EXHIBIT E

Augustus Charles Noha
A# 29-979-444
January 25, 2005

Dear Sir or Madam:

Re: **8 CFR § 241.4**

   **Request for conditional release**

The above listed alien has been detained at Krome Processing Center, 18201 SW 12 Street , Miami, Florida 33194 since August 11, 2004. We humbly request his release from custody for the following undermentioned reasons.

a.   **Special 212(c) *8 CFR § 1003.44(e)(j)*** He qualifies for the above stated relief as modified and became effective on October 28, 2004 (*ST CYR* final rules). We are currently getting all the neccessary documents to file the said motion in his court of last jurisdiction. He meets all the requirements referenced in the final rules. We are aware that the deadline to file this motion is April 26, 2005. We are confident that we would file the said motion before the expiration date.

b.   **(i) Withholding of removal (241(b)(3)(ii) Convention Against Torture (8 CFR § 208.18 (b)(3)(ii))).** He qualifies for and is seeking withholding of removal and Convention Against Torture. 241(b)(3) clearly stipulates "The Attorney General shall not deport an alien, if aliens life or freedom would be threatened on account of race, race, religion, nationalty, membership of a particular social group, political opinion. He is seeking witholding of deportation under:

   1.   Past Persecution

   2.   Religious Persecution

There is well documented and overiding proof that he would be harmed on return to his country of origin. Respondent removal proceeding commenced on or about **September 22, 1996**. So he qualifies also for Convention Against Torture determination that took effect on **March 22, 1999**, *8 CFR § 208.18(b)(3)(ii)*. This

regulation requires aliens with pending claims who are under final orders of removal to be given writen notice of their right to seek re-opening, for the porpuse of presenting their convention claims to an immigration judge. A stay of removal remains in effect until thirty days service on alien. *8 CFR § 208.18(b)(3)(ii)(A)* Aliens with pending claims who seek re-opening are not subject to time and numerical limitations on motions to re-open imposed by *8 CFR §§ 1003.2 and 1003.23*. Respondent's final deportation order was in **June 1999**. This statute became effective on **March 22, 1999** so petitioner is eligible but he wasn't informed neither by BIA nor by EOIR. See Pg 6 of May 14, 1999 memo by chief immigration judge Micheal Creppy. The memo was reprinted in 76 interpreter releases 986-998 June 28, 1999.

c. **Pending Valid Citizenship Application –** Respondent has a valid naturalisation application that was neither denied nor granted. There is also substantial case law that stipulate that respondent is eligible to continue with his citizenship application irrespective of final deportation order. Respondent application preceded his removal proceeding, to explain a little further, respondent applied to become a US Citizen see *exhibit L*. He went and took the citizenship test and passed see file for copy, he was subsequently invited for swearing in on **September 24, 1996**, but petitioner got detained by INS on the **September 20, 1996**. Hence baring him from attending swearing in interview, see *exhibit D1* also see *exhibit 7,10,2* that clearly potray that respondent is still eligible to complete his citizenship process regardless of his conviction. See emphasis added *Gatcliffe Vs Reno 23* F Supp 2d 581 (DV/1998). Exhibit 2 **that stipulate that respondent is a US national and hence not deportable.** Moreover, his citizenship application was before his conviction and subsequent deportation proceeding commencement. See *8 USCA § 1001(9)(21)* for definition of national "A person not a citizen who owes permanent allegiance to the United States". His citizenship exam respondent denounced his country of origin and swore an oath plegding permanent allegiance to the United States. See See *Ngwana Vs Attorney General* of US 40 F Supp 2d 319 (D Md 1999) *US Vs Morin* 80 F 3d 124 (4th cir 1996) see generally *Asemani Vs Islamic republic of Iran* 266 f supp 2d (DDC 2003). Filling of an intent to naturalise, a naturalisation application the oath of allegiance and participation, in the naturalisation interview by Iranian plaintiff demonstrated suficient

②

permanent alleggiance to sue under foreign sovereign immunities act (FSIA) as **National of the United States,** see *Lee Vs Aschcroft* 216, F supp 2d, 51 (EDNY 2002). See also *Shittu vs Elwood* 204,F Supp 2d 876, 880, (E.D PA 2002). See emphasis added *Marcantonio Vs US* 185 F. 2d 934(4th cir. 1950)(denial of naturalization based on crimes commited prior to the five year statutory period would have effect of adding to statute a condition that it does not contain. Respondent's application has been in abeynace. Contrary to regulatory and case Law that stipulate that if INS fails to make a decision on a naturalization application within 120 days, the applicant can go to the U.S District for relief INA §336(b) IN *Miller VS INS* F. Supp 2d-CIV Number 7 01 CV 00178(W.D VA May 28 2001) reported in 78 interpreter release 1412 (Aug 31 2001). The District Court opined that INS could not delay adjudicating a naturalization application within 120 days because, it wanted to wait for the outcome of an indictment, against the applicant. To further Butress respondent's eligibility see Exhibit 7 *Matter of Minette Kanga*. Interim decision # 3424 (BIA2000). This decision has entered after respondent final administrative order of June 1999. See *exhibit 4* respondent meets all the requirements stated therein. But see also in *Exhibits 1,2,3,4,5,7,8,10,* Respondent is eligible to complete his citizenship process nothwithsanding his final deportation order, See *Exhibit 7 Matter Kanga* Int 3424 (BIA2000) that clearly stipulate than an aggravated felon is eligible for naturalization. So respondent is <u>a U.S national and hence not deportable</u>.

d. **Medical Condition** - Respondent requires and is need of urgent medical attention. That would involve to major surgeries, to correct lower back and upper neck injuries. See attached medical records that show injuries sustained plus a referal to a neurosurgeon for surgery.

e. **Government Assistance** - Respondent has prefered to be off assistance, if and when called upon; seen attached letter marked *exibit 2* to to further butress that point.

**f. No significant likely hood of removal** - Respondent has enumerated numerous reliefs that he is eligible for and he intends to pursue these to extent allowed by Law, terminating at The Supreme Court Level. If need be, respondent also had to address his medical situation, a combination of all these factors, most importantly for the fact that respondent might be a <u>US national</u> and in due course, be allowed to swear in as a U.S citizen. Leads respondent to assess that there is no Likelihood of removal in the forseable future. That also any attempt to remove respondent prior to exhausting all the right accorded him, by Law and due process would be unlawful.

Respondent is forwarding a copy of this correspondence the Nigerian Consulate in Washington D.C to aprise them of all the issues herein mentioned. If for unimaginable respondent does not prevail in all the above mentioned, he would still be under the custody of ICE, and could be removed. See <u>*Daniel Benitez Vs Michel Rozos*</u> feild office Director ICE # 037434 (U.S CT January 12 2005).

" The Court further held that the presumtive period during which the detention of an alien is reasonably necessary to effectuate his removal is six months. After that the alien is eligible for conditional release, if he can demostrate that there is NO significant likelihood of removal in the forseable future". Id at 701 Respondent is currently eligible for the entire waiver herein described. Moreover any release by ICE is guarded, it is not per se total release. See <u>*Benitez Vs Michel Rozos*</u>, Director ICE Miami #03-7434(U. S ct January 12 2005) Justice O'Connor concuring " finally, any alien released as a result of today's holding remains subject to the conditions of supervised release. See <u>*8 USC § 1231(a)(3); 2 CFR § 241.5*</u> (2004) and if he fails to comply with conditions of release he will be subject to criminal penalties, Including further detention. See <u>*8 USC § 1253(b)*</u>. Zadvydas Supra at 695 (" We nowhere deny the right of congress to subject aliens to supervision within the condition when released from detention or to incarcerate them where appropriate for violation of these conditions")

**g. No finnaity to reliant conviction** - Convictions that are on direct appeal cannot attain a sufficient degree of finalty for immigration purposes. See <u>*Pino Vs Landon*</u> 349 US 901 (1955) <u>*Matter of Ozkok*</u> 19 I & N Dec 546,552 7 (BIA 1988) in light of (2) two supreme

(4)

court decisions that stipulate that the "federal sentencing Guidelines" as it was applied in respondent's case violates the sixth amendment. (By having a judge not a jury find sentencing facts *see United States Vs Freddie J Boker* #04104 (USCT Jan12, 2005. See also *US Vs Duncan FanFan* # 04-105 (USCt January 12, 2005). See emphasis added *Blakely vs Washington* 542 (USCT 2004). These cases are relevant to respondent in that his charge of being an aggravated felony includes monitary damages exceeding $10,000. Respondent did not plea to or admits these damages. The above-cited Supreme Court has opined that a federal judge can only sentence a defendant to what he pled to and not what the government alleged. So "Sentencing Guidelines" as it was applied in respondent case has been ruled "Unconstitutional" petitioner is going to file a motion with US District Court of the Southern District of Florida. To re-open and re-sentence respondent to what pled to. By so doing petitioner would not qualify as an aggravated felon under INA. Because he pled to damages that are not up to $10,000. This action would void respondent's deportation order as it now exists and expedite respondent citizenship application that is in abeyance since September 24, 1996. Even though he has met all the requirements. See *United States Vs Booker* (USCT Jan 12, 2004) "The consequences of such a drastic change unaided by usual process of legislative deliberation, are likely to be sweeping. For example, the majority unneccessarily broad remedy sends every federal sentence back to the drawing board or at least into the novel for "reasonableness" regardless of whether those individuals constitutional rights were violated". The responden't status as an LPR *Zadvydas Vs Davis*, 121 S Ct 2491, 2500-01(2001) (" The due process clause applies to all person within the US including aliens whether their presence here is lawfull, unlawfull, temporay or permannent. ( *SEE EXHIBIT 19* )

h. **Release Conditons -** I am not a flight risk or a threat to public safety as referenced in *exhibits 22, 30.* I have been rehabilated and lived a productive life since 1996. That I made that a fatal error; I am currently employed by Planet Automotive in Miami Lakes, Florida. Job that I have had for the past 7 years. I still have a $50,000 bond that was the condition for my release since 1996. (They could utilise the same bond as condition for release. It is still effective.) I am willing also, if the depatment decide against utilising the said bond.



To adhere to any release conditions that ICE may consider as appropriate for aliens in like situation.

i.  **Equity** - I have been married for 13 years to an American Citizen, have a 12years old daughter. Lived in South Florida for the same period of time. Currently a member of the Admistrative Board at Miami Lakes United Methodist Church. Remorsefull 1st times offender. Gainfully employed taxpayer. Also paying restitution to the US District Court. Petitioner acknowledges his debt to society plegdes, upon release to continue to be off good conduct. See exhibit 2, petitioner meets the entire requirement as evidence in exhibit 30, with to the said exhibit.

   *Item 1:* Petitioner country would not accept him in his current medical condition. Surgery and recovery time is aproximately 18-24 months. The consular office considers him as a medical burden. Also petitioners insurance would not be valid for treatment abroad.

   *Item 2:* Petitioner is completely non-violent and would continue to maintain that status upon release.

   *Item 3:* Petitioner has been out on bond for 8 years, and had no incidences. Petitioner during his conviction completed 3 years of supervised release with no infractions.

   Item 4: Petitioner does not pose any flight risk, whatsoever, he further acknowledges, if this grace is accorded him it would amount to " <u>utmost ignorance</u>" To flee. Petitioner during the 8 years of being on bond reported for every appointment.

j.  **Good Moral Character** – Citizenship application requirement stipulate that applicants must be good moral character 5 years preceding the application. If arguendo that petitioner did not meet that requirement on 24 September 1996. He meets and exeeds the 5 years today. So he is eligible.

h.  **Conclusion** - Petitioner pleads with authorities to show mercy and leniency in evaluating his review. He would have been detained for aproximately 6 months on the 11th of February 2005. Has not had any issue with the authorities. Petitioner still has his job

waiting for him and would continue to pay his restitution of aprox $33k. Petitioner pleads with authorities to enable him to get some urgent medical care, he is currently confined to a wheel chair, and Krome Detention center was not designed to accoomodate handicaped detainees. It is very hard for me to move around, take showers. I have volunteers that currently assist me. Thank you for your anticipated assistance. I sincerely appreciate your kindness. God Bless You. Petitioner continues to ask for forgivance and be allowed one last chance for this 8 years old infraction. Prays that somebody will please forgive him even if he has pay off the balance of his restitution in one instalment.


CC: Marcy Rosario
CC: Nigerian Embassy, Washington DC
CC: HQPDU Washigton, DC
CC: Field Office Director, Miami
CC OFFICE OF INSPECTOR
        GENERAL   WASHINGTON D C


(7)

EXHIBIT L

CITIZENSHIP APPLICATION
RECIEPT

# UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE  N400 |
|---|---|---|
| SRC-96-184-50593 | | APPLICATION FOR NATURALIZATION |
| RECEIPT DATE | PRIORITY DATE | APPLICANT  A29 979 444 |
| June 11, 1996 | | NOHA, AUGUSTUS C. |
| NOTICE DATE | PAGE | |
| June 11, 1996 | 1 of 1 | |

AUGUSTUS C. NOHA
2425 NW 112 ST
MIAMI FL 33167

**Notice Type:** Receipt Notice.

Fee Previously Collected.

The above application has been received. You will be notified of the date and place of your interview when you have been scheduled at the MIAMI District Office. The average processing time is approximately 12 months.

Please notify this office of any changes in your address.

You can fulfill the government and history requirement prior to your naturalization interview by taking the standardized Citizenship Test approved by INS and offered at many locations in your community for a small fee. The test takes about 30 minutes to complete. You must answer some basic questions on U.S. history and government, and write two simple sentences in English.

Passing this test does not exempt you from the oral English language requirement. However, at your naturalization interview with the INS you will be asked to respond in ordinary English only about information on your application.

Call toll-free 1-800-755-0777 to find out where you can take the Standardized Citizenship Test prior to your interview with the INS.



EXHIBIT 1

Please see the additional information on the back. You will be notified separately about any other cases you filed.

IMMIGRATION & NATURALIZATION SERVICE
TEXAS SERVICE CENTER
P O BOX 152122 - DEPT A
IRVING TX 75015-2122
Customer Service Telephone: (214) 767-7769



# EXHIBIT

# 2[A]

# ATTORNEY GENERAL'S

# LETTER REQUESTING RELEASE

U.S. De          ient of Justice

United States Attorney
Southern District of Florida



99 N.E. 4 Street  Suite 800
Miami, Florida 33132-2111

October 25, 1996

Robert A. Wallace
District Director
U.S. Immigration and Naturalization
   Service
Attn:  George Waldrop
       Special Assistant to the District
       Director
7880 Biscayne Blvd.
11th Floor
Miami, FL 33138

Re:  AUGUSTUS CHARLES NOHA

Dear Mr. Wallace:

    It has been brought to my attention that AUGUSTUS CHARLES NOHA is presently being detained at Krome for deportation.  NOHA was convicted of credit card fraud in U.S. v. Augustus Charles Noha, 96-90-CR-HIGHSMITH, and sentenced on September 19, 1996.  NOHA was sentenced to 4 months incarceration, 120 days of home confinement with electronic monitoring, and 3 years of supervised release. Prior to his release from the term of incarceration, NOHA was detained by INS.

    As you know, NOHA is a Nigerian national.  The underlying investigation which led to his arrest and conviction was conducted by the Nigerian Task Force unit of the U.S. Secret Service.  From the time of his arrest until his sentence, NOHA has provided invaluable cooperation which, in turn, has allowed the Secret Service to penetrate a heretofore, impenetrable Nigerian credit card fraud operation.  Additionally, NOHA has provided a quantum of information which has been assessed by the Secret Service as tremendously valuable to other investigations regarding the Nigerian operations.

    The U.S. Secret Service believes that this defendant can be of further assistance and had contemplated continued use of NOHA's cooperation post-incarceration.  However, due to NOHA's present detention pending deportation, the contemplated continued cooperation has not been possible.

NOHA h.    no prior criminal histo.    Also, he obtained work while he was on bond prior to sentencing, he acknowledged responsibility for his criminal conduct, and has expressed a desire to continue his cooperation with the U.S. Secret Service.

In fact, NOHA has provided invaluable assistance and the U.S. Secret Service is in need of his continued assistance. It would be greatly appreciated if INS could fashion some form of relief which would allow NOHA to remain in the U.S. in order to continue his cooperation with on-going investigations by the U.S. Secret Service, in which NOHA's assistance is necessary.

If you have any questions or would like to discuss the matter further, please contact me at (305) 536-4032.

Sincerely,

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

MARVELLE McINTYRE-HALL
ASSISTANT UNITED STATES ATTORNEY

EXHIBIT 22

MANDATORY REVIEW

ICE 90 DAYS

WAS DONE 2/1/05

WAS DUE 11/11/04

* SEE UNDERLINED

Case 1:05-cv-01362-RWR    Document 2-2    Filed 07/06/2005    Page 31 of 75

# INTERPRETER RELEASES

Report and analysis of immigration and nationality law

THOMSON
WEST

Vol. 81, No. 16 • April 19, 2004

## IN THIS ISSUE

. Hutchinson Issues New Guidance in Response to
   OIG Report on Treatment of 9/11 Detainees

2. Ninth Circuit Finds BIA Violated Own Precedent .......
3. USCIS Increases Application Fees ............................... 517
4. ICE Issues Final Notice on SEVIS Preliminary Fees;
   Application Deadline is May 14. ............................... 519
5. State Dept. Instructs on H–1B, H–2B Processing in
   Light of Caps. ......................................................... 519
   State Dept. Updates Prevailing Wage Requirements
   for Domestic Employees ......................................... 520
7. House, Senate Committees Hold Hearings on
   Natz Oath and Temporary Guest Workers ................ 521
8. Newly Introduced Legislation ................................... 525
9. State Dept. Releases Visa Numbers for May ............... 525
10. OMB Items ............................................................. 526
11. Noteworthy ............................................................. 526
12. Notice of Changed Text ............................................ 527
13. Position Opening ..................................................... 527
14. Seminars ................................................................ 527

## 1. Hutchinson Issues New Guidance in Response to OIG Report on Treatment of 9/11 Detainees

Asa Hutchinson, Under Secretary for Border and Transportation Security for the Department of Homeland Security (DHS), issued new guidance on March 30, 2004, on U.S. Immigration and Customs Enforcement's (ICE's) implementation of detainee-related policy and practice changes recommended by the Department of Justice's Inspector General last June, in a report detailing alleged incidents of abuse of the September 11 detainees.[1]

[1]  The full text of the report, "The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks," is available at:

Among other things, the memorandum notes that custody determinations generally must be made within 48 hours of arrest, except in the event of an emergency or other extraordinary circumstance, which is undefined in the regulations. In the event of such circumstance, the memo states, a custody determination will be made "as soon as practicable." The DHS construes "emergency or other extraordinary circumstance to include: (1) a significant infrastructure or logistical disruption including, but not limited to, disruption caused by an act of terrorism, weather, natural catastrophe, power outage, serious transportation emergency, or serious civil disturbance; (2) whenever there is a compelling law enforcement need, including, but not limited to, an immigration emergency resulting in the influx of large numbers of detained aliens that overwhelms agency resources and makes it unable to meet the general servicing requirements logistically; or (3) individual facts or circumstances unique to the alien including, but not limited to, the need for medical care or a "particularized compelling law enforcement need." The latter is to be determined at the level of a Special Agent in Charge, Border Protection Chief, Field Office Director, or equivalent position. Any determination that a compelling law enforcement need exists will be reviewed by the official making the determination and the ICE Office of the Principal Legal Advisor no later than 30 days after the decision, to "determine whether the factors leading to such a determination continue to exist."

*http://www.usdoj.gov/oig/special/0306/*. See 80 Interpreter Releases 805 (June 9, 2003) (discussing the report); 80 Interpreter Releases 977 (July 21, 2003) (discussing a hearing on the report before the Senate Judiciary Committee); 81 Interpreter Releases 38 (Jan. 12, 2004) (supplemental report). For discussion of the DOJ's and DHS's responses to the OIG's report, see 81 Interpreter Releases 4 (Jan. 5, 2004); 80 Interpreter Releases 80 Interpreter Releases 1710 (Dec. 19, 2003); 80 Interpreter Releases 1637 (Dec. 8, 2003).



At the conclusion of the 90-day removal period that carries mandatory post-order detention, the memo states, the Field Office Director must review the alien's case and determine whether he or she is to be released. To release the alien, the Director must find that the alien is neither a threat to public safety nor a flight risk. If these conditions are met, the memo states, the Director should release the alien on an order of supervision. If these conditions are not met, the Director may retain authority over the case for an additional 90 days, and before that period is up, the Director must again review the case to see whether the alien may be released under 8 CFR § 241.4. If the alien still is not released, the case must be referred to the Post-Order Detention Unit (HQPDU), which will conduct reviews under 8 CFR §§ 241.13 and 241.14 to determine whether there is a significant likelihood that the alien should be released in the reasonably foreseeable future, or whether the alien has a special circumstance justifying continued detention. The memo reminds Field Office Directors to elevate cases involving such aliens at the "earliest possible point in the case."

Once the case is referred to the HQPDU, the memo states, if the determination is made that there is no significant likelihood that the alien will be removed in the reasonably foreseeable future, "the alien must be released from custody." The only way to maintain an alien in custody is to refer the alien for further consideration under 8 CFR § 241.14 due to special circumstances justifying continued detention," the memo states, adding that if HQPDU determines that removal is likely in the foreseeable future, the case remains governed by 8 CFR § 241.4 and HQPDU reviews the case under the same criteria as outlined above.

Further, the memo notes, under 8 CFR § 241.14, HQPDU can order the continued detention of an alien whose removal is not significantly likely in the reasonably foreseeable future if the alien meets any of the following "general criteria: highly contagious disease that is a threat to public safety; serious adverse foreign policy consequences; national security or terrorism concerns; or deemed to be specially dangerous."

The memo notes that the DHS is reviewing and discussing approaches during "periods of national impact" to handling cases in which the Federal Bureau of Investigation (FBI) has expressed interest because of national security concerns. The procedures outlined above are effective immediately; the DHS will provide additional details on the process to be implemented during such periods of national impact.

The memo directs ICE personnel and attorneys to review independently the individual circumstances of each case in which the FBI requests detention solely based upon information regarding an alien's possible association with terrorism: "ICE personnel and attorneys must carefully study the underlying facts in each case and make assessments as to both the necessity for detention and the appropriate conditions of confinement in every case," to ensure that "ICE can make the proper recommendations to the immigration courts on bond, detention and removal."

The memo, which notes that it is intended to provide internal agency guidance and does not create any rights that are enforceable by law, contains additional details about use of the Notice of Custody Determination (Form I–286) and the Notice to Appear. The memo is reproduced in Appendix I. ∎

## 2. Ninth Circuit Finds BIA Violated Own Precedent

The U.S. Court of Appeals for the Ninth Circuit ruled that the Board of Immigration Appeals (BIA) "acted contrary to law" in looking to the strength of an alien's relationship with his stepfather in denying the alien's motion to reopen. *Medina-Morales v. Ashcroft*, No. 02–73924, 2004 WL 736995 (9th Cir. Apr. 7, 2004).

The petitioner, a native and citizen of Honduras, entered the U.S. in 1986 without being admitted or paroled. His mother married a U.S. citizen in 1992. Although the couple began living separately in 1996, they have not divorced and, the court of appeals noted, they have no plans to do so. In 1993, the petitioner returned to Honduras, seeking an immigrant visa to the U.S. Even though the petitioner's visa request was denied, he returned to the U.S. anyway. The INS[2] issued a Notice to Appear to the petitioner on August 13, 1998, alleging that he was a removable alien. A hearing was held on November 5, 1998, at which the petitioner stated his intention to apply for adjustment of status based upon his stepfather's U.S. citizenship. At hearings held in October and November of 1999, the petitioner's stepfather failed to appear to testify in connection with the adjustment of status petition that he had filed on his stepson's behalf. Consequently, pursuant to INA § 240B (8 USCA § 1229c), the petitioner accepted a grant of voluntary departure until February 29, 2000. He withdrew his adjustment application and waived his right to appeal, the court of appeals noted.

---

[2] On March 1, 2003, the INS's administrative, service, and enforcement functions were transferred to the newly created Department of Homeland Security (DHS). The reorganization was required by the Homeland Security Act, Pub. L. No. 107–296, 116 Stat. 2135, codified primarily at 6 USCA § 101 et seq. See 80 Interpreter Releases 305 (Mar. 3, 2003) (reporting on and reproducing final rule facilitating the transfer); 68 Fed. Reg. 9824–46 (Feb. 28, 2003) (implementing transfer).



INTERPRETER RELEASES (ISSN 0020-9686) is published weekly, except the second week in June, the first week in September, and the last week in November and December • Principal Attorney Editor: Patricia Mariani • Principal Attorney Editor: Patricia Minikon • Senior Principal Editor: Christine M. Hanson • Published by West Group, 901 Fifteenth St., NW, Suite 1010, Washington, DC 20005 • Customer Service: (800) 328-4880, ext. 65411 • Editorial Office: (202) 337-7000 • http://www.fedpub.com/ • Periodicals postage paid at St. Paul, MN • POSTMASTER: Send address changes to INTERPRETER RELEASES, P.O. Box 64526, St. Paul, MN 55164-0526.

## THE UNITED STATES
## FEDERAL DISTRICT COURT
## WASHINGTON, D.C.



### EXHIBIT 3 OF 3 CONTINUED

**NOHA CHARLES AUGUSTUS,**
    **Petitioner,**

    **VERSUS**

**DAVID VENTURELLA, Director HQ-PDU**
**MICHAEL CHERTOFF, Secretary, Dept of**
**Homeland Security**
**FEDERAL REPUBLIC OF NIGERIA, ETAL**
    **Respondents.**
_____/

EXHIBIT 30

6 MONTHS REVIEW/RELEASE

EXHIBIT 90

> **WARNING:** In the wake of the Supreme Court's decision in *Demore v. Kim*, the ICE has been sending letters to lawful permanent residents who fall within the mandatory detention provisions of §236(c) and who were previously released on bond, ordering them to turn themselves in for detention. Failure to comply will result in losing the bond money. The ICE has also been arresting people subject to the mandatory detention provisions when they appear for their hearings, even if they had previously been released on bond. If you have a client with a conviction that makes him subject to mandatory detention, you need to warn him that he will be subject to mandatory detention, and that he could be arrested in court.

## 2. Mandatory Detention After a Final Order of Removal

*[Replace the entire text under this section, beginning on page 10-26, with the following]*

What happens if someone has a final order of removal, but no country will take him? This scenario occurs frequently. Countries such as Vietnam, Laos, and Cuba will not take people back after they have been ordered removed from the United States.

INA § 241(a)(1)(A) mandates that a final order of removal must be carried out within a 90 period, called the "removal period." INA § 241(a)(2) requires that persons subject to final orders of removal may be detained during the removal period, and that persons who have been found inadmissible or removable for criminal or security related grounds *must* be detained during this time.

In 2001, in a case called *Zadvydas v. Davis* [533 U.S. 678 (2001)], the U.S. Supreme Court decided that detention of aliens with final orders of removal under INA § 241 is limited to a period that is reasonably necessary to bring about the person's removal, and does not permit indefinite detention. The court designated six months as a "reasonably necessary period" to bring about deportation. After six months, if an alien provides good reason to believe that there is no significant likelihood that he'll be removed in the reasonably foreseeable future, the Government must rebut that showing.

Even before the Supreme Court's ruling, INA § 241(a)(3) provided that persons subject to final orders of removal could be released under supervision after the 90-day removal period was over. However, INS was detaining many people who had little or no possibility of being returned to their home countries for very long periods of time. That's why the Supreme Court ultimately had to decide the issue.

### a. Regulations Governing Release of Aliens up to Six Months After Final Order.

Regulations governing the terms and procedures for release are found beginning at 8 CFR § 241.4. The INS issued proposed regulations to implement the Supreme Court's decision in *Zadvydas* in November 2001. The proposed regulations left standing the established procedures to secure the release of individuals from detention in the first six months following a final order of removal. Those procedures are discussed in this section. However, the proposed regulations significantly modified the procedures after the six-month period.



Under this regulation, persons who are inadmissible or removable for criminal or security grounds, for prior immigration violations, or who are determined to be "a risk to the community or unlikely to comply with the removal order" may be detained beyond the removal period. INA § 241(a)(6); 8 CFR § 241.4(a) & (b). The regulation authorizes local ICE Directors to continue to detain such individuals during the 90-day removal period plus an additional three months. 8 CFR § 241(c)(1).

People detained under this section have a right to all notices, decisions, or other documents in connection with custody reviews made by either by District Directors or the Headquarters Post-Order Detention Unit (HQPDU).[1] The decision must specify the reasons for continued detention. 8 CFR § 241.4(d). People detained under this section also have the right to representation by an attorney or other representative. 8 CFR § 241.4(d)(3).

If an individual can demonstrate that his or her release from custody will not pose a danger to the community or the safety of people or property, and s/he is not a flight risk, s/he may be released from custody. 8 CFR § 241.4(d)(1).

However, before someone with a final order of removal can be released from detention, the District Director must make the following findings:

1.  Travel documents are unavailable or immediate removal is not practicable or in the public interest;
2.  The detainee is now a non-violent person, and will remain so if released;
3.  The detainee is not likely to violate the conditions of release; and
4.  The detainee does not pose a significant flight risk if released.

8 CFR § 241.4(e).

The type of evidence the District Director will use to determine a person's eligibility for release following the 90-day removal period is specified at 8 CFR § 241.4(f). This evidence includes such things as the person's criminal history, if any, disciplinary record, psychological or psychiatric reports, and evidence of rehabilitation. Someone who refuses to cooperate with the INS' efforts to secure travel documents for their deportation will be denied release. 8 CFR § 241.4(g)(4).

Detainees who remains in custody six months after the entry of the removal order must seek custody reviews from the Executive Associate Commissioner, acting through the HQPDU. 8 CFR § 241.4(c)(2).

> **b.    Regulations Governing Release of Aliens More Than 6 Months Following a Final Order of Removal.**

---

[1] District Directors and HQPDU are still referenced in the regulations, even though the Immigration & Naturalization Service has been dissolved and its functions taken over by the ICE, CBP, CIS divisions of the Department of Homeland Security. Note that the ICE is the division with authority over detained aliens.

EXHIBIT 39

DECISION TO

CONTINUE DETENTION

EXHIBIT 39

of Detention and Removal Operations
U.S. Department of Homeland Security
801 I Street, NW
Washington, DC 20536



## U.S. Immigration and Customs Enforcement

Agustus NOHA (A29 979 444)
C/O ICE Krome North SPC
18201 SW 12th Street
Miami, FL 33194

## Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed and it has been determined that you will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE) at this time. This decision has been made based on a review of your file and/or your personal interview and consideration of any information you submitted to ICE's reviewing officials.

The Consulate of Nigeria has confirmed your identity as a native and citizen of Nigeria. Your removal to Nigeria has been authorized by the Embassy. Arrangements are being made to remove you to Nigeria and you will be removed within the reasonable foreseeable future.

Based on the above, you are to remain in ICE custody pending your removal from the United States. You are advised that you must demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE's efforts to remove you by taking whatever actions ICE requests to effect your removal. You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 USC Section 1253(a).

_____
Signature of HQPDU Director/Designated Representative

MAR 2 3 2005
_____
Date

SWORN AFFIDAVIT

FOR (FSIA)

# SOJORN AFFIDAVT

I NOHA CHARLES AUGUSTUS SOLEMNLY SWEARS
THAT.

1) THAT HE HAS NOTIFIED MR AHMED UMAR
OF THE NIGERIAN EMBASSY AT 3519 INTERNATIONAL
COURT WASHINGTON DC.
THAT HE IS A "NATIONAL" OF THE UNITED STATES.
HENCE HIS CITIZENSHIP OF NIGERIA HAS
CEASED, ALSO HIS "PERMANENT ALLEGIANCE IS
NOW OWED TO THE UNITED STATES

2) THAT NUMEROUS CORRESPONDENCE, AND PHONE
CONTACTS AT 202-822/557. SPANNING FROM
AUGUST 25TH TILL APRIL 28TH 2005.
STIPULATING SAME.

3) THAT HE FURTHER INFORMED THEM OF HIS
INTENTION TO FILE A LAWSUIT UNDER THE
FOREIGN SOVEREIGN IMMUNITIES ACT BECAUSE
THE ONLY REASON SUFFICED BY HQ-PDU
ALL THIER CORRESPONDENCE FOR PETITIONERS

CONTINUED DETENTION FOR MORE THAN 9 MONTHS WERE ASSURANCES FROM THE NIGERIAN EMBASSY. THAT THEY WOULD ISSUE TRAVEL DOCUMENTS. INSPITE OF THE NOTICE THAT HE WAS A U.S NATIONAL.

SWORN THIS DAY _ 5/25/05

NAME  AUGUSTUS C AJOHA

SIGNATURE - _____

Carla Ryland
My Commission DD247336
Expires September 04, 2007     5/25/05

EXHIBIT 40

U.S NATIONAL
DEPORTED



subsequent admission, when he applied for adjustment of status, that he was not married at that time; the court said that it was surely reasonable for the BIA to conclude that the petitioner's action was intentional and fraudulent. The BIA's finding about his sham marriage was also reasonable, the court stated, and went on to hold that that finding provided the BIA with additional support for denying the petitioner's motion to reopen. Thus, the court concluded, the BIA's denial of the petitioner's motion to reopen was not an abuse of discretion.

Scott D. Pollock, Pollock & Associates, Chicago, Illinois, for the petitioner. ∎

## 7. ICE Deports Alien Who Never Took Public Oath of Allegiance to Complete Naturalization Process

The U.S. Immigration and Customs Enforcement (ICE) announced April 18, 2005 that it had deported Celestine Ifeanacho Okafor, a native of Nigeria who had contended that he could not be deported because he was a naturalized U.S. citizen.



Okafor entered the U.S. in 1990 and married a U.S. citizen, becoming a lawful permanent resident in 1991. He applied for naturalization in 1994. On March 31, 1995, he attended a citizenship interview to answer questions pertaining to his naturalization application. At that time, he signed a printed document bearing the oath of renunciation and allegiance that is required of all persons applying for citizenship and he was recommended to be approved for citizenship; however, he never participated in the public oath of allegiance ceremony and never received a certificate of naturalization. On November 7, 1997, Okafor was convicted of separate conspiracies to commit mail fraud, wire fraud, and money laundering. Thereafter removal proceedings were brought against Okafor.

Okafor contended before the immigration judge (IJ) that he was a U.S. citizen because he signed the printed oath during the naturalization interview. On March 1, 2000, the IJ found Okafor removable as charged, finding that he was not a citizen because he had not taken the oath of allegiance required of applicants for naturalization. As Okafor sought no relief from removal, the IJ ordered him removed.

The respondent appealed the IJ's determination that he was not a naturalized citizen to the Board of Immigration Appeals (BIA). On November 14, 2000, a BIA panel determined that, in signing the printed oath before the interviewing immigration official, Okafor successfully completed the naturalization process. The panel therefore sustained the appeal and terminated the removal proceedings.

The INS (now the Department of Homeland Security) filed a motion with the BIA requesting reconsideration and reopening of the proceedings. On March 30, 2001, the BIA panel issued a decision denying the motion and terminating the proceedings. On July 25, 2002, the INS referred the BIA's decisions to the Attorney General for review pursuant to 8 CFR § 3.1(h)(1)(iii). On December 1, 2004, the Attorney General issued a decision finding that Okafor did not meet the requirements for becoming a naturalized U.S. citizen because he did not take the oath of allegiance in a public ceremony as required by INA § 337(a)[36] and did not meet any of the exceptions to the "public ceremony" requirement. The Attorney General therefore reversed the prior BIA's decisions.

On December 20, 2004, in an unpublished decision, the BIA vacated the BIA decisions of November 14, 2000 and March 30, 2001, and, since the only issue raised by Okafor on appeal from the IJ's decision related to his claim to citizenship, the BIA dismissed his appeal of the IJ's decision of March 1, 2000, and ordered him removed to Nigeria pursuant to the IJ's order of March 1, 2000. *Matter of Okafor*, A71 525 474, 2004 WL 3187211 (BIA 2004).

---

**Footnotes**

[36] 8 USCA § 1448(a).        ∎

## 8. Newly Introduced Legislation

The following immigration-related measures were introduced since Congress returned from its spring recess through April 19, 2005:

HOUSE OF REPRESENTATIVES

April 14, 2005

Rep. Vic Snyder (D–Ar.) introduced H.J. Res. 42,[37] a joint resolution proposing an amendment to the U.S. Constitution to permit persons who are not natural-born citizens of the U.S., but who have been citizens for at



MEDICAL RECORDS

CONFIDENTIAL

# EXHIBIT A

# COMPLAINT

# LETTER

WE GOT MOVED FROM KROME TO EL PASO TEXAS
WHILE AT EL PASO TEXAS, I NOTIFIED MEDICAL STAFF
OF THE CONSTANT PAIN THAT I WAS HAVING
BUT I WAS GIVEN TYLENOL AND HEATING PAD
ALL ATTEMPTS TO BE SEEN BY A MEDICAL DR.
WHERE DENIED OR DISREGARDED, I MADE NUMEROUS
SICK CALLS REQUESTS, BUT I WAS GIVEN MORE
TYLENOL TABS.
THE MEDICAL STAFF SAID THAT THEY COULD NOT
TREAT ME UNTIL WE GOT BACK TO MIAMI THE
CONDITION GOT WORSE, BUT I WAS MADE TO GET ON
PLANE TRIPS ( U.S. MARSHALLS) HAVE RECORD AND CAN
DOCUMENT THE ORDEAL THAT I WENT THROUGH ON
THOSE FLIGHTS.
I WAS TAKEN FROM EL PASO TEXAS TO NEW
ORLEANS INSTEAD OF MIAMI THAT I WAS TOLD THAT I
WOULD SEE A DOCTOR ON RETURN .
I WAS PUT IN PRISON IN NEW ORLEANS THAT IS
WHERE I HAD THE SCARE OF MY LIFE.
D.H.S. OFFICERS TOLD ME THAT I WOULD GET
MEDICAL ATTENTION ONCE WE GOT TO THE PRISON
ONCE I WAS DROPED OFF THE PRISON OFFICER
TOLD ME THAT THE NURSE THAT WAS SUPPOSED TO
SEE ME LEFT AT 6:00PM. AND I WAS IN DROPED OFF
ABOUT 8:00PM. I WAS IN SO MUCH PAIN, THAT THE
DETAINEES ALMOST STARED AN UPRISING BECAUSE
THE OFFICERS COMPLETELY NEGLECTED ME FOR
HOURS.
WHEN THE DETAINEES DEMANDED I GET MEDICAL
ATTENTION THE OFFICERS PROMISED THEY WERE
TAKING ME TO SEE THE NURSE.
BUT INSTEAD THEY TOOK ME IN MY WHEEL CHAIR
TO LOCK ME UP IN SOLITARY CONFINEMENT FOR 3
DAYS (72 HRS.) JUST TO GET ME OUT SIGHT.
BUT EVEN THERE I WAS IN SO MUCH PAIN
THAT THE PRISIONERS CAME TO MY RESCUE BY

BANGING ON THEIR CELLS FOR HOURS BEFORE THE
OFFICERS CAME AND RELUCTANTY RUSHED ME TO THE
EMERGENCY ROOM IN NEW ORLEANS, (EVEN IN THE
STATE THAT I WAS THEY STILL CHAINED, SHACKLED
MY LEGS, AND HANDS WHILE THEY TOOK ME TO E.R.
THE DOCTOR SAW MY CONDITION AND REPRIMANDED
THE GUARDS.
HE GAVE ME MEDICATION TO LAST ME FOR THE
WEEKEND, AND RECOMENDED I FOLLOW UP
IMMEDIATELY WITH MY DOCTOR (ON MONDAY)
BECAUSE IT WAS WEEKEND.
WHILE I WAS IN PRISON ~~xxxxxxxxxxxxxxxxxxx~~ IN
NEW ORLENS. <u>I GOT SEXUALLY HARRASSED TWICE</u>
<u>I HAD TO BUY MY WAY OUT. I STILL HAVE REOCURING</u>
<u>NIGHTMARES OF THIS ORDEAL EVEN WEEKS LATER.</u>
I WAS MOVED TO NEW YORK, FROM NEW ORLEANS
WITHOUT SEEING A DOCTOR, IN PAIN WHEN I GOT
TO NEW YORK, I NOTIFIED THEM OF MY CONDITION.
BUT THEY GAME MORE PAIN MEDICATION
THEY WERE SUPRISED THAT P.H.S. MIAMI WOULD LET
ME TRAVEL IN THAT CONDITION THAT I WAS
THE SAME SENTIMENT EXPRESSED BY THE U.S.
MARSHALLS THAT TRANSPORTED ME.
BUT THE HEAD NURSE TOLD ME THAT THEY COULD
NOT TREAT ME BECAUSE A NURSE SIGNED ON MY
DEPORTATION PAPER THAT I WAS MEDICALLY FIT
AND IN EXCELLENT CONDITION. SHE WAS SHOKED
WHEN I TOLD HER THAT NEVER UNDER WENT ANY
EXAMINATION AS TO MY HEALTH WITH ANY BODY
IN P.H.S. MIAMI, BUT ON THE CONTRARY THEY WERE
AWARE OF MY LOWER BACK PROBLEM, HIGH BLOOD
PRESSURE.
SHE PRODUCED A SIGNED DOCUMENT ACERTAINING
THAT I WAS MEDICALLY FIT.
MY AMBASADOR REFUSED TO ISSUE TRAVEL
DOCUMENTS WHEN HE SAW MY CONDITION AND
THAT I NEEDED TO RETURN TO MIAMI
TO DO THE TWO SUGERIES THAT I NEED TO DO.

BEFORE THEY WOULD CONSIDER ISSUING ANY
TRAVEL DOCUMENTS, I WAS PUT ALSO IN DETENTION
IN NEW YORK AND ON CONSTANT PAIN KILLERS, I
GOT MOVED FROM NEW YORK BACK TO NEW
ORLEANS PRISON. THIS TIME THEY REFUSED TO GIVE
ME MEDICATION AND PUT ME IN THE SAME DORM
WITH MURDERERS, SERIOUS CRIMINALS.
FOR ABOUT 4 DAYS, I WAS MOVED FROM NEW ORLEANS
BACK TO MIAMI, IT HAS BEEN OVER A MONTHS I HAVE
GIVEN MY MEDICAL RECORDS BUT I'M YET TO HAVE
THE SURGERIES DONE
I HAVE PROVIDED THESE RECORDS TO P.H.S. TO
EXPEDITE THIS MATTER BUT TO NO AVAIL.
TREATMENTS. I AM AWARE THAT KROME DOES NOT
TREAT PRE EXISTING CONDITION, I HAD MADE
ARRANGEMENT PRIOR TO MY DETENTION TO UNDER GO
2 MAJOR SUGERIES TO RECTIFY MY CONDITION, MY
DOCTOR, SAID THE TWO PROCEDURES ARE VERY
COMPLICATED THAT THERE WAS A 50/50 CHANCE
THAT I WOULD COME OUT WORSE THAT I WAS
BEFORE, THE PROCEDURE RECOVERY TIME WAS
FROM 18/24 MONTHS THE TWO PROCEDURES WOULD
COST $185,000, AND 164,000 RESPECTIVELY TOTAL ($
349,000)
APROXIMATELY ASSUMING NO COMPLICATIONS.
BECAUSE OF MY HIGH BLOOD PRESURE, THAT I STAND
TO LOOSE A LOT OF BLOOD DURING THESE
PROCEDURES. I DO HAVE INSURANCE THAT WOULD
COVER 95% OF THAT COST, I HAVE TO UNDER GO A
BATTERY TEST PRIOR TO THE SURGERY, I HAVE TO DO
THE LOWER BACK SURGERY FIRST AND AFTER THE
UPPER NECK SURGERY.
THERE IS NO AMOUNT OF PAIN KILL;ERS THAT P.H.S.
GIVE ME THAT CAN TREAT MY CONDITION, I AM
PROGRESSIVELY GETTING WORSE.
KROME CONDITION: I AM CURRENTLY CONFINED TO
A WHEEL CHAIR IT IS A CHALLENGE TO GET
AROUND

HERE IN KROME TAKE SHOWERS MOVE AROUND THIS
FACILITY DOES NOT HAVE ACCESS FOR WHEEL CHAIR
I NEED HELP TO GET AROUND AND THESE ARE
VOLUNTEERS THAT HAVE BEEN OF ASSISTANCE TO ME.
BUT THERE IS SO MUCH THEY CAN DO ALSO.

*EXHIBIT C*

**OMI**
*Medical Imaging*
AVENTURA



**Joint Commissi**
on Accreditation of Healthcare O

Schedule ID:            265262
Account Number:         0000119396
Patient's Name:         AUGUSTUS NOHA
Social Security:        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
Referring Physician:    LARRY KATZ MD
Date Of Service:        4/28/2004 2:30:00 PM
Reason:                 L SPINE MRI W/O CONTRAST
**Final (Electronically Signed)**

HISTORY: Lower back pain.

TECHNIQUE: Standard pulse sequences through the lumbar spine were obtained.

FINDINGS: There is minimal retrolisthesis of L5 upon S1. The rest of the
vertebral bodies are demonstrated in stable anatomical alignment. The height of
the vertebral bodies are preserved. There is no compression fracture or
subluxation. No infiltrative or focal bone marrow lesion is identified. No
paraspinal mass.

The conus medullaris ends at approximately L1-2. The nerve roots of the cauda
equina are anatomically aligned. There is no intradural mass.

L5-S1: There is desiccation and narrowing of the disk with degenerative endplate
changes and osteophytes. There is a central disk herniation abutting the ventral
thecal sac. There is light cranial migration of the disk material. The disk is
abutting but not displacing the S1 nerve roots.  No stenosis of the spinal canal
or neural foramina.

L4-L5: There is desiccation and narrowing of the disk. There is a right
paracentral disk herniation with an annular tear abutting the ventral thecal
sac. The disk is abutting and slightly displacing the right L5 nerve root. The
disk is abutting but not displacing the left L5 nerve root. No stenosis of the
spinal canal or neural foramina.

L3-L4, L2-L3 and L1-L2: The disks are of normal height and signal intensity.
There is no bulging or focal disk herniation. There is no stenosis of the spinal
canal, lateral recesses or neural foramina.

IMPRESSION:

1. RIGHT PARACENTRAL DISK HERNIATION AT L4-5 ABUTTING AND SLIGHTLY DISPLACING
THE RIGHT L5 NERVE ROOT AS WELL AS ABUTTING BUT NOT DISPLACING THE LEFT L5 NERVE
ROOT. .

2. CENTRAL DISK HERNIATION AT L5-S1 ABUTTING BUT NOT DISPLACING THE S1 NERVE
ROOTS.

3. THE REST OF THE DISK INTERVALS ARE UNREMARKABLE FOR SIGNIFICANT BULGING OR
FOCAL DISK HERNIATION.

MAY    7 2004



AVENTURA



Joint Commission
on Accreditation of Healthcare Or

Account Number: 119396
Patient Name: AUGUSTUS NOHA
Reason: L SPINE MRI W/O CONTRAST


Physician:                Germaine Rodriguez,MD
Transcriptionist:         H A



AVENTURA



Joint Commis
on Accreditation of Healthcar

Schedule ID:          265261
Account Number:       0000119396
Patient's Name:       AUGUSTUS NOHA
Social Security:      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
Referring Physician:  LARRY KATZ MD
Date Of Service:      4/28/2004 2:00:00 PM
Reason:               C SPINE MRI W/O CONTRAST
Final (Electronically Signed)

HISTORY:  Neck pain.

TECHNIQUE:  Standard pulse sequences through the cervical spine were obtained.

FINDINGS:  There is reversal of the cervical curvature. The height of the vertebral bodies is preserved. There is no compression fracture or subluxation. No infiltrative or focal bone marrow lesion is identified. There is no paraspinal mass.

The spinal cord is of normal signal intensity.  There is no demyelination, syrinx, or focal mass.  The cervicomedullary junction appears normal.

There is diffuse desiccation and narrowing of the disks, worse at C5-C6 and C6-C7.

C2-C3:  There is a central disk herniation abutting the ventral thecal sac. There is no stenosis of the spinal canal or neural foramina.

C3-C4:  There is a mild bulging of the disk abutting the ventral thecal sac. There is no stenosis of the spinal canal or neural foramina.

C4-C5:  There is a broad-based bulging disk abutting the ventral thecal sac. There is no stenosis of the spinal canal. There is mild  stenosis of the neural foramina.

C5-C6:  There is posterior osteophytic ridging and a broad-based bulging disk abutting the ventral thecal sac. There is no stenosis of the spinal canal. There is severe stenosis of the neural foramina due to uncovertebral osteophyte and facet joint hypertrophy.

C6-C7:  There is posterior osteophytic ridging and a broad-based bulging disk abutting the ventral thecal sac. There There is no stenosis of the spinal canal. There is severe stenosis of the neural foramina due to uncovertebral osteophyte and facet joint hypertrophy.

C7-T1:  There is a small central disk herniation abutting the ventral thecal sac. There is no stenosis of the spinal canal, lateral recesses, or neural foramina.

IMPRESSION:

MAY    7 2004



AVENTURA



Joint Com
on Accreditation of Healt

Account Number: 119396
Patient Name: AUGUSTUS NOHA
Reason: C SPINE MRI W/O CONTRAST

1. MULTILEVEL SPONDYLOSIS AND DEGENERATIVE DISK DISEASE.

2. CENTRAL DISK HERNIATION AT C2-C3.

3. BROAD-BASED BULGING OF THE DISK FROM C3-C4 TO C6-7.

4. SMALL CENTRAL DISK HERNIATION AT C7-T1.

5. STENOSIS OF THE NEURAL FORAMINA AT C5-C6 AND C6-C7, DUE TO UNCOVERTEBRAL
OSTEOPHYTE AND FACET JOINT HYPERTROPHY.

Physician:            Germaine Rodriguez,MD
Transcriptionist:     V L

# Referral Authorization

METCARE SKYLAKE (110164)
18300 N.E. 19th Avenue
North Miami Beach, FL 33179
(305) 949-7273

01/08/2002 11:28:10AM

Carrier: Humana
Center Nbr: 110164

Referral Authorization No.  00010121          Referral Date: 01/08/2002    Referral Type: R - Routine

## Patient Information:

Name:       NOHA, AUGUSTUS C                                    Group    90809
Address:    2425 NW 132 ST  MIAMI, FL 33167
Phone:      (305) 323-6659
DOB:        11/18/1960
Member ID: 324862695-00

## Referral Information:

Number of Visits:        1
Appointment Date:   01/09/2002
Appointment Time:      3:15 PM          Exp. Date:  02/07/2002

| ICD Code | Description |
| --- | --- |
| 724.1 | PAIN IN THORACIC SPINE |

## Authorized Facility:

Outpatient Facility:                                          Tax ID.

Specialist:       OMI MRI NETWORK,
Address:          20880 WEST DIXIE HWY  STE # 111
                  AVENTURA, FL 33180
Phone:            (305) 933-9565              FAX: (305) 933-8105    Tax ID: 650781813
Primary Care Phys: KATZ, LARRY., M.D.
Address:          18300 N.E. 19TH AVENUE
                  N. MIAMI BEACH, FL 33179
Phone:            (305)949-7273             FAX: (305)949-8025     Tax ID: 133406385

FAXED BY JAN 0 8 2002

## Authorized Services :

[  ]  Evaluation Only          [  ] Evaluation w/Treatment     [  ] Anesthesia
[X]  Diagnostic Testing        [  ] Home Health Care/Hospice   [  ] Inpt. Cons/Hospital Visi
[X]  Outpatient Surgery        [X] Therapy Svr (PT/OT/RT,etc   [  ] X-Rays
[  ]  Total OB Care            [  ] Ambulance                  [  ] Lab Rpt
[  ]  ER/Urgent Care           [  ] Durable MED Equipment      [  ] Case Summary
[  ]  Asst.Surgery             [  ] RX/Injectables

## PCP's Special Information:

Non-Par Code:          Payment Code        Non-Par Amt:    0.00  Par Provider:          Capitated Provider:

## Comments:

MRI OF THE C SPINE AND LS SPINE WITH AND WITHOUT GADOLINIUM

Payment for referred services is subject to member benefit limitations and contract exclusions, and dependent upon the member's eligibility at the time of service. This referral is not a guarantee of payment.



**Health Care Services Review Results**

| | |
|---|---|
| Type of Request: | Specialty Care Review (Referral) |

| | | |
|---|---|---|
| Payer: | BCBSF | Phone #: |

BlueCross BlueShield
of Florida

| | | |
|---|---|---|
| Certification #: | 335943028 | Certification Date: |
| Effective Date: | 05/27/2004 | Expiration Date:  11/23/2004 |
| Status: | Certified in Total | Reject Reason: |

**Subscriber**

| | |
|---|---|
| Subscriber Name | NOHA, AUGUSTUS |
| Subscriber ID | XJG32486269501 |

**Patient**

| | |
|---|---|
| Date of Birth | 11/18/1960 |
| Gender | Male |

**Requesting Provider**

| | |
|---|---|
| Provider Name | KATZ, LARRY |
| Provider Tax ID | 650635748 |
| Payer Assigned Provider ID | 61538 |
| Provider Type | Referring |
| Provider Specialty | General Practice |

**Diagnosis Codes**

| | Type | Code | Date |
|---|---|---|---|
| 1 | Principal Diagnosis | 724.6 | 05/27/2004 |
| 2 | Diagnosis | 724.4 | 05/27/2004 |

**Referred to Provider / Facility**

**Physician, Clinic or Group Practice**

| | |
|---|---|
| Provider Name | OSBORN, BRETT A |
| Payer Assigned Provider ID | 81127 |
| Address | 20295 NE 29TH PL STE 300 AVENTURA FL 331804109 |

Provider Type                          Performing

Provider Specialty                     Neurosurgery Only

Facsimile                              (786) 428 1062

Telephone                              (786) 428 1059

Physician, Clinic or Group Practice

Provider Name                          KATZ, LARRY

Payer Assigned Provider ID             61538

Address                                18300 NE 19TH AVE
                                       NORTH MIAMI BEACH FL 331795032

Provider Type                          Primary Care Physician

Provider Specialty                     General Practice

Facsimile                              (305) 949 8025

Telephone                              (305) 949 7273

Service Information 1

Request Information

Certification Type                     Initial

Status                                 Certified in Total

Certification Number                   335943028

Type of Service                        Medical Care

Service Quantity                       8 Visit(s)

Service Location

Place of Service / Facility Type       Office

Service Date                           05/27/2004 - 11/23/2004

Transaction Id: 42200660

Print

*Case pended @ H Options per Pnt*
*Clinical review .-26-04. FV*

# OMI
## Medical Imaging

OMI of AVENTURA
20880 West Dixie Hwy., Suite 111
North Miami Beach, FL 33180
Tel. 305·933·9565
Fax 305·933·8105

YOUR APPOINTMENT IS ON
Date: _____
Time: _____
Transport:      ☐ Y      ☐ N
☐ OPEN MRI ☐ HIGH FIELD ☐ CT SCAN

## PATIENT INFORMATION

Patient Name: _Augustus Nobra_   SS No.: _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_
DOB: _11/18/60_   Home Tel.: _305 323 6659_   Work Tel.: _____   Other Phone: _____
Patient Address: _68 NW 96 st Miami Fl 33150_

## INSURANCE INFORMATION

Insurance Name: _H Options_   Tel. No.: _1-866-326 6302_   Group No.: _____
Policy No.: _324 8626950_   ID No.: _____   Claim No.: _____
Authorization No.: _41103230N (L5 Spine)_   Date of Accident: _NA_
Attorney Name: _N/A_   Tel. No.: _____

## PHYSICIAN INFORMATION

Patients with pacemakers, intracranial aneurysm clips or who may be pregnant are excluded from having a MRI

Referring Physician: _Kotz_   Telephone: _305 949-7273_
Office Contact: _Fanny_   Ext.: _35_
Comparison Films: _____   Fax Report to: _305 949-7225_
Diagnosis: _723.4 / 721.0 / 756.11_
Special Instructions from referring physician: _Please schedule ASAP_
Would you like us to contact your office with your patient's appointment date and time?   ☐ YES   ☐ NO
Physician's Signature: _see RP_   Date: _04/19/04_

| MRI/MRA PROCEDURE | | |
|---|---|---|
| **HEAD/SPINE** | Without Contrast | With & Without Contrast |
| Brain | ☐ 70551 | ☐ 70553 |
| IAC's | | ☐ 70553 |
| Pituitary | | ☐ 70553 |
| Orbits | ☐ 70540 | ☐ 70543 |
| Cervical Spine | ☐ 72141 | ☒ 72156 |
| Thoracic Spine | ☐ 72146 | ☐ 72157 |
| Lumbar Spine | ☒ 72148 | ☐ 72158 |
| **BODY/SOFT TISSUE** | Without Contrast | With & Without Contrast |
| Neck | ☐ 70540 | ☐ 70543 |
| Brachial Plexus | ☐ 73218 | ☐ 73220 |
| Chest | ☐ 71550 | ☐ 71552 |
| Abdomen | ☐ 74181 | ☐ 74183 |
| Pelvis | ☐ 72195 | ☐ 72197 |
| **MUSCULOSKELETAL** | | With or Without |
| Shoulder | 73221 | ☐ R ☐ L |
| Elbow | 73221 | ☐ R ☐ L |
| Wrist | 73221 | ☐ R ☐ L |
| Hand | 73218 | ☐ R ☐ L |
| Hip | 73721 | ☐ R ☐ L |
| Femur | 73718 | ☐ R ☐ L |
| Knee | 73721 | ☐ R ☐ L |
| Lower Leg | 73718 | ☐ R ☐ L |
| Ankle | 73721 | ☐ R ☐ L |
| Foot | 73718 | ☐ R ☐ L |
| **MR ANGIOGRAM** | With Contrast | With & Without Contrast |
| MRA Head/COW | ☐ 70544 | ☐ 70546 |
| MRA Neck/Carotids | ☐ 70547 | ☐ 70549 |

| CT PROCEDURE | | | |
|---|---|---|---|
| **HEAD/NECK** | Without Contrast | With Contrast | With & Without Contrast |
| Head or Brain | ☐ 70450 | ☐ 70460 | ☐ 70470 |
| Orbit | ☐ 70480 | ☐ 70481 | ☐ 70482 |
| Sinus | ☐ 70486 | ☐ 70487 | ☐ 70488 |
| Neck | ☐ 70490 | ☐ 70491 | ☐ 70492 |
| **SPINE/PELVIS** | | | |
| Cervical Spine | ☐ 72125 | ☐ 72126 | ☐ 72127 |
| Thoracic Spine | ☐ 72128 | ☐ 72129 | ☐ 72130 |
| Lumbar Spine | ☐ 72131 | ☐ 72132 | ☐ 72133 |
| Pelvis | ☐ 72192 | ☐ 72193 | ☐ 72194 |
| **CHEST/BODY** | | | |
| Chest | ☐ 71250 | ☐ 71260 | ☐ 71270 |
| Abdomen | ☐ 74150 | ☐ 74160 | ☐ 74170 |
| **LOWER/UPPER EXTREMITY** | | | |
| Upper Extremity | ☐ 73200 | ☐ 73201 | ☐ 73202 |
| Lower Extremity | ☐ 73700 | ☐ 73701 | ☐ 73702 |
| **CT ANGIOGRAPHY** | | | |
| CTA Head | ☐ 70496 | | |
| CTA Neck | ☐ 70498 | | |
| CTA Chest | ☐ 71275 | | |
| CTA Abdomen | ☐ 74175 | | |
| CTA Pelvis | ☐ 72191 | | |

OTHER: _C-Spine Auth 41103229N_   CPT: _____

WWW.HERALD.COM

# BACK PAIN?

Do you suffer from: *DEGENERATIVE DIS*
*DISEASE, HERNIATED or BULGING DIS(*
*FACET SYNDROME, SCIATICA or just*
*DEBILITATING BACK PAIN?*

Have you had surgery and experienced
**NO PAIN RELIEF?**

*or*

Are you **CONSIDERING SURGERY**
for your current pain?

Are you **TIRED of PAIN MEDICATIONS?**

Are you like thousands who believe **THER**
**IS NO RELIEF from LOWER BACK PAIN**

If you answered yes to any of the above
then you may be a candidate for a
**NON-SURGICAL** and **NON-INVASIVE**
procedure with a scientifically
**PROVEN 86% SUCCESS RATE.**

Call today to reserve a seat for a FREE SEMINAR on
PAIN MANAGEMENT by NATIONALLY RECOGNIZED
**NEUROSURGEON THOMAS PURTZER, MD.**

Dr. Purtzer has successfully treated thousands of patien
who have given up hope for living a pain free life or wh
do not want to consider surgery or harsh medications.

Dr. Purtzer's seminar includes a
**QUESTION & ANSWER PERIOD.**

**ease RSVP by November 29, 2004**

**HURRY, seating is LIMITED for this ONE TIME SEMINAR**

## Call (800) 506-9919
### or
## (305) 825-4796



sit our website @ www.back2backs.com

FT. LAUDERDALE - 3111-506-92
(N⊗ of Oakland Pk. Blvd.) 954-566-92
\C.A.

# PARKWAY DIAGNOSTIC CENTER

1400 NE Miami Gardens Drive * Suite 206 * North Miami Beach, FL 33179
PHONE (305) 947-9729  *  FAX: (305) 947-4378

**DR. LARRY KATZ**
18300 NE 19TH AVE. APT#:
NORTH MIAMI BCH, FL 33179

**ATN DR:** KATZ, LARRY                    **ALT DR:** ,

---

## FINAL RESULT

**TIENT: NOHA, CHARLES**              **PT#: 1000127583**       **DATE:** 01/08/2004

10-SPINE,LUMBAR COMP W/OBLIQ--(DRD/778) ORD#: 90001

CLINICAL HISTORY:

FULL RESULT: Indication: Low back pain.


Findings:


There is straightening of the lumbar lordosis without any rotoscoliosis.
The vertebral bodies are intact without evidence of fracture, dislocation,
ytic or blastic changes. There is narrowing of the L5 disk space. The
remainder of the disk spaces appear unremarkable. Transverse and spinous
processes are intact. Pedicles are present throughout. The sacrum shows no
sseous abnormalities. The S/I joints are patent bilaterally. There is
o spondylolysis. There is 6 mm of anterior subluxation of C5 under C4.
mall joints show no arthritic changes.



IMPRESSION:Impression:


  Straightened lordosis possibly secondary to muscle spasm.


  Chronic degenerative disk disease of  L5 with anterior subluxation of
 under L5 but no significant        small joint arthritis.

---

information contained in this transmission is privileged and confidential. It is intended only for the use of
individual or entity named below. If the reader of this message is not the recipient, you are hereby notified
any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received
communication in error, please notify us immediately.

READ BY DR:  JULIAN R. KANTER    D/T: 01/09/2004 01:18PM
SIGNED BY DR:  JULIAN R. KANTER D/T: 01/12/2004 07:57AM
TRANS BY:     D/T:  01/12/2004 08:28AM
ORDERED BY: DR. LARRY KATZ

DOS: 01/08/2004 02:48PM

3/11/04

Information contained in this transmission is privileged and confidential.  It is intended only for the use of
individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
communication in error, please notify us immediately by t......

03/11/2004 06:03PM

# PARKWAY DIAGNOSTIC CENTER

1400 NE Miami Gardens Drive * Suite 206 * North Miami Beach, FL 33179
PHONE (305) 947-9729  *  FAX: (305) 947-4378

---

**DR. LARRY KATZ**
18300 NE 19TH AVE. APT#
NORTH MIAMI BCH, FL 33179

ATN DR: KATZ, LARRY                    ALT DR:

---

## FINAL RESULT

TIENT: NOHA, CHARLES   *Augusta*   PT#: 1000127583      DATE: 01/08/2004

50-SPINE, CERVICAL, 5 VIEWS—(DRD764) ORD#: 90001

CLINICAL HISTORY:

FULL RESULT: Indication: Neck pain, radiculopathy.


findings:


There is marked straightening of the cervical lordosis. The vertebral
bodies are intact without evidence of fracture. There is further marked
arrowing of the C5 and C6 disk spaces. Osteophytic spurring is seen
anteriorly at those levels. There is 5 mm of anterior subluxation of C6
under C5. Small joints show no arthritic changes at the C5-6. The spinous
processes are intact. No cervical ribs are seen. The odontoid is
unremarkable on the lateral view. There is encroachment of the neural
foramina at on the right side and  C6 on the left side.


IMPRESSION:


   Chronic degenerative disk disease at C5-6 with anterior subluxation of
and associated small joint arthritis and cervical spondylosis.


P:   MRN # 1000 127583

---

Information contained in this transmission is privileged and confidential. It is intended only for the use of
individual or entity named below. If the reader of this message is not the recipient, you are hereby notified
any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received
communication in error, please notify us immediately

PT:   MRN # 1000 127583

READ BY DR:   JULIAN R. KANTER   D/T: 01/09/2004 01:00PM
SIGNED BY DR:   JULIAN R. KANTER D/T: 01/12/2004 07:58AM
TRANS BY:     D/T:  01/12/2004 08:29AM
ORDERED BY: DR. LARRY KATZ                          DOS: 01/08/2004 02:48PM

3/11/05

Information contained in this transmission is privileged and confidential.  It is intended only for the use of
individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
communication in error, please notify us immediately by telephone  and

# PARKWAY DIAGNOSTIC CENTER

1400 NE Miami Gardens Drive * Suite 206 * North Miami Beach, FL 33179
PHONE (305) 947-9729  *  FAX: (305) 947-4378

**DR. LARRY KATZ**
18300 NE 19TH AVE. APT#:
NORTH MIAMI BCH, FL 33179

**ATN DR:** KATZ, LARRY                    **ALT DR:** ,

---

## FINAL RESULT

**PATIENT: NOHA, CHARLES**          **PT#: 1000127583**      **DATE: 01/08/2004**

72110-SPINE,LUMBAR COMP W/OBLIQ—(DRD/778)  ORD#: 90001

CLINICAL HISTORY:

FULL RESULT: Indication: Low back pain.

Findings:

There is straightening of the lumbar lordosis without any rotoscoliosis.
The vertebral bodies are intact without evidence of fracture, dislocation,
lytic or blastic changes. There is narrowing of the L5 disk space. The
remainder of the disk spaces appear unremarkable. Transverse and spinous
processes are intact. Pedicles are present throughout. The sacrum shows no
osseous abnormalities  The S/I joints are patent bilaterally. There is
no spondylolysis. There is 6 mm of anterior subluxation of C5 under C4.
Small joints show no arthritic changes.

IMPRESSION:Impression:

1.   Straightened lordosis possibly secondary to muscle spasm.

2.   Chronic degenerative disk disease of  L5 with anterior subluxation of
L5 under L5 but no significant       small joint arthritis.

The information contained in this transmission is privileged and confidential.  It is intended only for the use of
the individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
that any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
this communication in error, please notify us immediately by telephone, and return the original message to us at
the address below via the U.S. Postal Service.  Thank you!

READ BY DR:   JULIAN R. KANTER   D/T: 01/09/2004 01:16PM
SIGNED BY DR:  JULIAN R. KANTER D/T: 01/12/2004 07:57AM
TRANS BY:    D/T:  01/12/2004 08:28AM
ORDERED BY: DR. LARRY KATZ

DOS: 01/08/2004 02:48PM

3/11/04

The information contained in this transmission is privileged and confidential.  It is intended only for the use of
the individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
that any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
this communication in error, please notify us immediately by telephone, and return the original message to us at
the address below via the U.S. Postal Service.  Thank you!

# PARKWAY DIAGNOSTIC CENTER

1400 NE Miami Gardens Drive * Suite 206 * North Miami Beach, FL 33179
PHONE (305) 947-9729 * FAX: (305) 947-4378

**DR. LARRY KATZ**
18300 NE 19TH AVE. APT#:
NORTH MIAMI BCH, FL 33179

**ATN DR:** KATZ, LARRY                    **ALT DR:** ,

## FINAL RESULT

**PATIENT: NOHA, CHARLES**   *Augusta*   **PT#:** 1000127583      **DATE:** 01/08/2004

**72050-SPINE, CERVICAL, 5 VIEWS**—(DRD/764) ORD#: 90001

CLINICAL HISTORY:

FULL RESULT: Indication: Neck pain, radiculopathy.

Findings:

There is marked straightening of the cervical lordosis. The vertebral
bodies are intact without evidence of fracture.  There is further marked
narrowing of the C5 and C6 disk spaces. Osteophytic spurring is seen
anteriorly at those levels. There is 5 mm of anterior subluxation of C6
under C5. Small joints show no arthritic changes at the C5-6. The spinous
processes are intact. No cervical ribs are seen. The odontoid is
unremarkable on the lateral  view. There is encroachment of the neural
foramina at on the right side and  C6 on the left side.

IMPRESSION:

1.  Chronic degenerative disk disease at C5-6 with anterior subluxation of
C6 and associated small joint arthritis and cervical spondylosis.

PT:  MRN # 1000 127583

The information contained in this transmission is privileged and confidential. It is intended only for the use of
the individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
that any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
this communication in error, please notify us immediately by telephone, and return the original message to us at
the address below via the U.S. Postal Service.  Thank you!

PT:   MRN # 1000 127583

READ BY DR:   JULIAN R. KANTER     D/T: 01/09/2004 01:00PM
SIGNED BY DR:   JULIAN R. KANTER D/T: 01/12/2004 07:58AM
TRANS BY:     D/T: 01/12/2004 08:29AM
ORDERED BY: DR. LARRY KATZ                              DOS: 01/08/2004 02:48PM

3/11/04

The information contained in this transmission is privileged and confidential. It is intended only for the use of
the individual or entity named below.  If the reader of this message is not the recipient, you are hereby notified
that any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received
this communication in error, please notify us immediately by telephone, and return the original message to us at
the address below via the U.S. Postal Service.  Thank you!

**HUMANA®**

**PRIORITY CARE RECORD**

| | |
|---|---|
| Date of Visit | 1-7-04 |
| Time In | Time Out |

| Patient Name | Social Security Number | Date of Birth | Sex | Center Number |
|---|---|---|---|---|
| Noha, Augustus | 324862695 | 11-18-1960 | ☒M ☐F | 11016 |

Address, City, State, Zip Code

Home Telephone

| Next of Kin | Telephone | Employer Name, Address, Telephone |
|---|---|---|

| Date of Last Visit to Primary Care Physician | Other Insurance Coverage? ☐AUTO ☐WORKER'S COMP ☐HEALTH CARE | Name of Carrier |
|---|---|---|

Allergies ☒NKA

Current Medications: Norvasc 5 QD

| | TIME | TEMP | PUL | RESP | B/P | INIT |
|---|---|---|---|---|---|---|
| | 11:45 | | 60 | 12 | 140/ | RN |
| | | 97.6° | | | 88 | |

Date of Last Tetanus

Undergone Immunization Series ☐YES ☐NO

LNMP | Weight 218

Chief Complaint

Nursing Assessment/Treatment: Time:_____ ☐AM ☐PM

Nurse's Signature

**S** 42 B/M fell backwards off a ladder ...

**O** ...AOx3 ...

**A** ...

**P** S/P Injury ... C-Spn ... L-Spn

| TIME | ORDERS |
|---|---|
| | ☐ Tetanus 0.5 ml IM |
| | ☐ CBC |
| | ☐ SMAC |
| | ☐ U/A |
| | ☐ Culture: |
| | ① C Spine |
| | ② L-Spine |
| | ③ pelvis |
| | ☐ X-Ray: |

Physician Signature

Diagnosis

Disposition: ☐HOME ☒RTC ☐AMA ☐ADMITTED TO FACILITY:_____

Transferred By ☐AMBULANCE ☐CAR

☐ INSTRUCTION SHEET GIVEN

S = Subject    O = Objective    A = Assessment    P = Plan

**SUBSEQUENT VISIT**

| Patient's Name | | Date | Sex | Age 305 | Phone |
|---|---|---|---|---|---|
| Noha, Augustus | | 1-15-04 | M | 41 | 323-6659 |

☐ Associate  ☐ Group  ☐ Medicare F.F.S.
☐ Gold Plus Plan  ☐ Private  ☐ Work/Comp.

I.D. # 32406 2695   _____ Group # _____

| VITAL SIGNS | TIME: | TEMP: | BP: | P: | R: | WT: | Taken By: |
|---|---|---|---|---|---|---|---|
| | 11:40 | 97.6° | 110/80 | 66 | 14 | 220 | R Drduck |

**SUBJECTIVE**  NKDA
41y ♂ c/o f/u — still has Nivase 5 QD
↑BP.

**OBJECTIVE**  A0x3
Heart ↓↓ ↓u
Lu CTA
A+ ref sat b 3⊕
Ext unta

**ASSESSMENT**  ① Cerumal 2 Lumbu interedply
② HTN.

**PLAN: DIAGNOSTIC STUDY** of pno genst will after + Spench

**MEDICATIONS:**  Vi Cepifen Tf Pt gily —

THERAPEUTIC REGIME: Activities: ☐ Ambulatory  ☐ Bed Rest  ☐ Limited  ☐ Exercises

| NUTRITION: | ☐ Regular Diet | ☐ Diabetic Diet | ☐ ( ) Calories | ☐ Low Fat | ☐ Low Salt/ | ( ) gm. Sodium | ☐ Ulcer Diet |
|---|---|---|---|---|---|---|---|

REFERRED TO NURSE FOR FURTHER HEALTH EDUCATION:   ☐ YES  ☐ NO   RTC:

PROVIDER'S NAME: _____   PROVIDER'S SIGNATURE: _____

**SUBSEQUENT VISIT**

| Patient's Name | | | Date | Sex | Age | Phone |
|---|---|---|---|---|---|---|
| Noha, Augustus | | | 3.11.04 | M | 42 | 323-6659 |

☐ Associate ☐ Group ☐ Medicare F.F.S.
☐ Gold Plus Plan ☐ Private ☐ Work/Comp.

I.D. # 324862695 ___ Group # _____

| VITAL SIGNS | TIME: | TEMP: | BP: | P: | R: | WT: | Taken By: |
|---|---|---|---|---|---|---|---|
| | 4:30 | 98.4° | 128/90 | 60 | 14 | 220 | Rebdesh |

**SUBJECTIVE** NKDA

② 42y ♂ I/H for F/U — feels ill    Ibuprofen ī 96°
pain in neck — CBP no improvement    increase 5° QD.
nurse + pilot unable to work
or disabled

**OBJECTIVE** AO×3    Neck tenderness C spin slight ↓ ROM.
Heart S1 S2 heart
Lungs CTA
(+) No edema no guarding Back tender L-S spine
Name No feel reflex DTN none elicited.

**ASSESSMENT** ① HTN
② chronic ? back reduced fully

**PLAN: DIAGNOSTIC STUDY:** MRI of L-S spine /
C - Spine /

**MEDICATIONS:** Motrin 600 ☑ BID

**THERAPEUTIC REGIME:** Activities: ☐ Ambulatory ☐ Bed Rest ☐ Limited ☐ Exercises

**NUTRITION:** ☐ Regular Diet ☐ Diabetic Diet ☐ ( ) Calories ☐ Low Fat ☐ Low Salt/ ☐ ( ) gm. Sodium ☐ Ulcer Diet

REFERRED TO NURSE FOR FURTHER HEALTH EDUCATION: LN ☐ YES ☐ NO RTC: _____

PROVIDER'S NAME: _____ PROVIDER'S SIGNATURE: _____

3/88

09179

**SUBSEQUENT VIS**

| Patient's Name | | Date | Sex | Age | Phone |
|---|---|---|---|---|---|
| Noha   Augustus  C | | 5-18-04 | M | 42 | 323-6659 |

☐ Associate  ☐ Group  ☐ Medicare F.F.S.
☐ Gold Plus Plan  ☐ Private  ☐ Work/Comp.    I.D. # 324862695   Group # _____

| VITAL SIGNS | TIME: | TEMP: | BP: | P: | R: | WT: | Taken |
|---|---|---|---|---|---|---|---|
| | 4:00 | 98.1° | 144/98 | 72 | 14 | 215 | By: Rodrich |

**SUBJECTIVE**  NKA

Ⓢ For F/u — to discuss the result of MRI
has LBP radiate to ® LE & toes
small toe feels numb. Neck pain
comes & goes. Patient expressed desire
if needed will do surgery.

**OBJECTIVE**  A O x3
Heart I S heart
lng CTA
Ext  Edema

**ASSESSMENT**  Radiculopath c̄ Lumbar disc dx
HTN

**PLAN: DIAGNOSTIC STUDY:**  Neurosurg consult — patient to
get name

**MEDICATIONS:**  Relafen c̄ Norvasc
Motrin 400 QD

**THERAPEUTIC REGIME:** Activities: ☐ Ambulatory ☐ Bed Rest ☐ Limited ☐ Exercises

**NUTRITION:** ☐ Regular Diet ☐ Diabetic Diet ☐ ( ) Calories ☐ Low Fat ☐ Low Salt/ ☐ ( ) gm. Sodium ☐ Ulcer Diet

REFERRED TO NURSE FOR FURTHER HEALTH EDUCATION: ☐ YES ☐ NO  RTC:

PROVIDER'S NAME: _____  PROVIDER'S SIGNATURE: _____

3/88

0917975

**SUBSEQUENT VIS**

| Patient's Name | | | | Date | Sex | Age | Phone |
|---|---|---|---|---|---|---|---|
| Noha  Augustus  C. | | | | 6-22-04 | M | 41 | 323-66 |

☐ Associate  ☐ Group  ☐ Medicare F.F.S.
☐ Gold Plus Plan  ☐ Private  ☐ Work/Comp.    I.D. # 324 86 2095   Group # _____

| VITAL SIGNS | TIME: 5.0 pm | TEMP: 98.6 | BP: 134/90 | P: 76 | R: 16 | WT: 223 lb | Taken By: AHO |
|---|---|---|---|---|---|---|---|

**SUBJECTIVE**

NKDA

Patient still has LBP

can't sit on chair for prolonged
pers

Nervous sy

Thyrojen
TGO PM

**OBJECTIVE**

Ao+3 p h

Heart I̅ I̅I̅I̅ her

Lungs CTA

Abd soft nont BS⊕

Ext + Neill

**ASSESSMENT**

HTN

Radiculopathy

**PLAN: DIAGNOSTIC STUDY:** Await neurosurgical consult

**MEDICATIONS:** See h/o

**THERAPEUTIC REGIME:** Activities: ☐ Ambulatory  ☐ Bed Rest  ☐ Limited  ☐ Exercises

| NUTRITION: | ☐ Regular Diet | ☐ Diabetic Diet | ☐ ( : ) Calories | ☐ Low Fat | ☐ Low Salt/ | ☐ ( ) gm. Sodium | ☐ Ulcer Diet |
|---|---|---|---|---|---|---|---|

REFERRED TO NURSE FOR FURTHER HEALTH EDUCATION:    ☐ YES  ☐ NO   RTC:

PROVIDER'S NAME: **LARRY KATZ M.D.**    PROVIDER'S SIGNATURE:

## Appendix C

# Universal Declaration of Human Rights

*On December 10, 1948, the General Assembly of the United Nations adopted and proclaimed the Universal Declaration of Human Rights, the full text of which appears in the following pages. Following this historic act, the Assembly called upon all Member countries to publicize the text of the Declaration and "to cause it to be disseminated, displayed, read and expounded principally in schools and other educational institutions, without distinction based on the political status of countries or territories."*

### Preamble

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

Whereas it is essential to promote the development of friendly relations between nations,

Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

Whereas Member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

Now, Therefore

THE GENERAL ASSEMBLY

proclaims

THIS UNIVERSAL DECLARATION OF HUMAN RIGHTS

as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

**Article 1.**   All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

**Article 2.**   Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or

## UNIVERSAL DECLARATION OF HUMAN RIGHTS

other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

**Article 3.**    Everyone has the right to life, liberty and security of person.

**Article 4.**    No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

**Article 5.**    No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

**Article 6.**    Everyone has the right to recognition everywhere as a person before the law.

**Article 7.**    All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

**Article 8.**    Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

**Article 9.**    No one shall be subjected to arbitrary arrest, detention or exile.

**Article 10.**    Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

**Article 11.** (1) Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.

(2) No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

**Article 12.**    No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

**Article 13.** (1) Everyone has the right to freedom of movement and residence within the borders of each State.

(2) Everyone has the right to leave any country, including his own, and to return to his country.

**Article 14.** (1) Everyone has the right to seek and to enjoy in other countries asylum from persecution.

(2) This right may not be invoked in the case of prosecutions genuinely arising from nonpolitical crimes or from acts contrary to the purposes and principles of the United Nations.

**Article 15.** (1) Everyone has the right to a nationality.

(2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.

f the
ry to
ning

hall

eat-

aw.
i to
any
: to

:ri-
:u-

le-
g-

o-
d

r
c
e
s

**Article 16.** (1) Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.

(2) Marriage shall be entered into only with the free and full consent of the intending spouses.

(3) The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

**Article 17.** (1) Everyone has the right to own property alone as well as in association with others.

(2) No one shall be arbitrarily deprived of his property.

**Article 18.** Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

**Article 19.** Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.

**Article 20.** (1) Everyone has the right to freedom of peaceful assembly and association.

(2) No one may be compelled to belong to an association.

**Article 21.** (1) Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.

(2) Everyone has the right to equal access to public service in his country.

(3) The will of the people shall be the basis of the authority of government; this shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

**Article 22.** Everyone, as a member of society, has the right to social security and is entitled to realization, through national effort and international cooperation and in accordance with the organization and resources of each State, of the economic, social and cultural rights indispensable for his dignity and the free development of his personality.

**Article 23.** (1) Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.

(2) Everyone, without any discrimination, has the right to equal pay for equal work.

(3) Everyone who works has the right to just and favourable remuneration ensuring for himself and his family an existence worthy of human dignity, and supplemented, if necessary, by other means of social protection.

(4) Everyone has the right to form and to join trade unions for the protection of his interests.

**Article 24.** Everyone has the right to rest and leisure, including reasonable limitation of working hours and periodic holidays with pay.

**Article 25.** (1) Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the

## UNIVERSAL DECLARATION OF HUMAN RIGHTS

event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.

(2) Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection.

**Article 26.** (1) Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.

(2) Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.

(3) Parents have a prior right to choose the kind of education that shall be given to their children.

**Article 27.** (1) Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.

(2) Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

**Article 28.** Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

**Article 29.** (1) Everyone has duties to the community in which alone the free and full development of his personality is possible.

(2) In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.

(3) These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

**Article 30.** Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

RECEIVED